J. Bernard Alexander III (State Bar No. 128307)
ALEXANDER MORRISON + FEHR LLP
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
(310) 394-0888
balexander@amfllp.com

Janel Quinn (*to be admitted pro hac vice*)
R. Scott Oswald (*to be admitted pro hac vice*)
The Employment Law Group, P.C.
1717 K Street, N.W., Suite 1110
Washington, D.C. 20006
Telephone: (202) 261-2803
jquinn@employmentlawgroup.com
soswald@employmentlawgroup.com
Attorneys for *Qui Tam* Relator

**FILED**

**Oct 17, 2022**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, *ex rel*. CRAIG FISHER, <br><br> 151 Atlantic City Avenue <br> Grover Beach, CA 93433 <br><br> *Plaintiff*s, <br><br> v. <br><br> OROVILLE HOSPITAL, <br> Registered Agent: <br> Robert J Wentz <br> 2767 Olive Highway <br> Oroville, CA  95966 <br><br> *Defendant*. | 2:22-cv-1829 TLN JDP <br><br> **Case No.** <br> _____ <br> **Complaint for Violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*.; California False Claims Act, Cal. Gov't Code § 12651 *et seq.*** <br><br> **FILED UNDER SEAL** <br><br> **Jury Trial Demanded** |

**INTRODUCTION**

1.      Craig Fisher ("Relator"), by and through his attorneys, individually and on behalf of the United States of America and the State of California, files this Complaint against Oroville Hospital ("Oroville") to recover damages, penalties, and attorneys' fees for violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and the California False Claims Act, Cal. Gov't Code § 12651 *et seq.*

2.      Relator is a practicing physician's assistant ("PA") who worked in the Emergency Room ("ER") at Oroville from approximately April 2021 through September 2021.

3.      During Relators time working at Oroville, he observed Oroville knowingly engage in the following fraudulent billing practices: (1) admitting Medicare and Medicaid patients from the Emergency Room for inpatient hospital stays that were not medically necessary; (2) admitting patients from the Emergency Room just prior to 12:00am to obtain additional reimbursement under the "two-midnight" rule; and (3) providing kickbacks to doctors and hospitalists to incentivize providers to admit patients for inpatient hospital stays.

4.      When Relator raised concerns about the above practices and attempted to admit only medically necessary patients, Relator was told that hospital policy was to "admit…admit…admit."

5.      Relator witnessed charge nurses putting in admit orders on every patient in the ER, including patients in the waiting room that had not been evaluated by a doctor or other healthcare provider, without verbal order given from a doctor or other healthcare provider.

6.      Relator witnessed the charge nurses putting in admit orders, as midnight approached to maximize reimbursement rates under CMS's two-midnight rule.

7.      Relator was told by doctors that they received kickbacks for each patient they admitted to the ER.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

9.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because the corporate defendants conduct business within this judicial district.

10.    Venue is proper in this Court under 28 U.S.C. § 1391(c) and 28 U.S.C. 2732(a) because the complained of illegal acts giving rise to this action occurred within this judicial district.

## THE PARTIES

11.    Relator is a citizen of the United States and a resident of Los Angeles, California.

12.    Relator is the "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), and to his knowledge of the information contained herein has not been publicly disclosed.

13.    Relator began working at Oroville as a Physician Assistant ("PA") in or around the April 14, 2021.

14.    Relator worked in the ER at Oroville until he resigned in or around August 30, 2021.

15.    Oroville is a non-profit hospital that primarily serves patients from a lower socio-economic status, including patients who are homeless.

16.    The majority of Oroville's patients are insured by Medicare and Medicaid.

17.    Oroville systemically improperly admits patients to maximize reimbursement and provides kickbacks to employees to encourage them to improperly admit patients to the ER.

## LEGAL OVERVIEW

### I.  The Federal False Claims Act

18.    The FCA prohibits knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). In addition, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

19.    The term "knowingly" as used in the FCA means that a person, with respect to information, (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA. *Id*.

20.    Any person who violates the FCA is liable for civil penalties. The amount of the civil penalty per each false claim resulting from these violations of the False Claims Act is currently listed as $11,665 to $23,331 per false claim for penalties assessed after June 19, 2020, when the associated violation occurred after November 2, 2015. 28 C.F.R. § 85.5.

### II.    Antikickback Statute

21.    The Anti-Kickback Statute prohibits any person or entity from offering or paying any remuneration to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. § 1320a-7b(g).

22.    The statute not only prohibits outright bribes and rebate schemes, but also prohibits offering inducements or rewards that has as one of its purposes to induce a physician to refer patients for services that will be reimbursed by a federal health care program.

23.    Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under Medicare.

24.    Accordingly, claims for reimbursement for inpatient or outpatient services under these programs that were the result of referrals tainted by kickbacks, are false claims and are not entitled to reimbursement.

### III.    California False Claims Act

25.    The California False Claims Act makes it unlawful to knowingly present or cause to be presented a false or fraudulent claim for payment or approval; knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim; or conspire to commit a violation of this California False Claims Act. *See* Cal. Gov't Code § 12651(a)(1).

26.    The California False Claims Act also makes it unlawful to knowingly make, use, or cause to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state. *See id.*

### IV.    Medicare Overview

27.    In 1965, Congress enacted Title XVIII of the Social Security Act under 42 U.S.C. §1395, *et seq.* ("the Medicare Program" or "Medicare") authorizing the federal government to pay for the cost of certain medical services for persons aged 65 and older.

28.    The United States, through the Department of Health and Human Services ("HHS"), administers the Medicare program.

29.    Part A of the Medicare Program is a federally subsidized hospital insurance system for disabled persons, blind persons, or persons who are 65 or older. Medicare Part A covers Medicare inpatient care, including care received while in a hospital, a skilled nursing facility, and, in limited circumstances, at home.

30.     Part B of the Medicare Program is a federally subsidized health insurance system for disabled persons, blind persons, or persons who are 65 or older. Eligible persons aged 65 and older may enroll in Part B of the Medicare Program to obtain benefits in return for payments of monthly premiums as established by HHS. Part B covers, in general, 80% of reasonably charged services and items other than hospital expenses, and 100% of clinical diagnostic services.

31.     Medicare Part B "usually covers emergency department services when you have an injury, a sudden illness, or an illness that quickly gets much worse." Emergency Department Services, Medicare, https://www.medicare.gov/coverage/emergency-department-services#:~:text=Medicare%20Part%20B%20%28Medical%20Insurance%29%20usually%20covers%20emergency,gets%20much%20worse.%20Your%20costs%20in%20Original%20Medicare.

32.     However, if you are "admitted to the same hospital for a related condition within 3 days of your emergency department visit… your visit is considered part of your inpatient stay" and will be covered by Medicare Part A. *See* Emergency Department Services, Medicare, https://www.medicare.gov/coverage/emergency-department-services.

33.     HHS has delegated the administration of the Medicare Part B Program to its component agency, the Health Care Financing Administration ("HCFA").

34.     Medicare Part C, also known as a Medicare Advantage Plan, is another Medicare plan that is offered by private companies, approved by Medicare.

35.     When an individual joins a Medicare Part C plan, the plan provides all Part A and Part B coverage.

36.     Medicare pays a fixed amount every month to companies offering Part C plans, and these companies must follow rules set out by Medicare. *See* What is Medicare Part C?, HHS, https://www.hhs.gov/answers/medicare-and-medicaid/what-is-medicare-part-c/index.html.

37.     Medicare reimbursement to providers of medical services under Medicare Part A and Medicare Part B is accomplished through private insurance carriers ("carriers"), as provided by 42 U.S.C. § 1395u. The carrier, on behalf of the Medicare Program, reviews and approves claims submitted for reimbursements by Medicare providers.

38.     At all relevant times hereto, Defendant signed or caused to be executed provider agreements with Medicare that permitted Defendant to submit claims to, and accept payment from, the Medicare program for services provided by Defendant.

39.     As a condition of participation in the Medicare Program, providers agree to be familiar with, and abide by, the program's reimbursement policies. In particular, the facility certifies to the following requirements:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

> I agree that any existing or future overpayment made to the supplier by the Medicare program may be recouped by Medicare through the withholding of future payments.

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

*See* CMS Form 855-B, Medicare Enrollment Application.

40.     Accordingly, Defendant has a duty to be knowledgeable of the statutes, regulations, and guidelines regarding coverage for Medicare services.

41.     Absent certain exceptions that are inapplicable here, Medicare does not cover, and providers agree not to submit claims for, services provided that are not necessary, not appropriately administered, or not properly documented. 42 U.S.C. § 1395u.

42.     In short, for Defendant to be properly reimbursed by the Medicare Program, CMS requires that the treating physician order the applicable medically necessary services, and appropriately document the justification and administration of those services.

43.     The carrier makes payment on those claims which appear to be eligible for reimbursement on behalf of the United States. 42 U.S.C. § 1395u(a). Claims may be made by the beneficiaries or by providers who have received assignment from beneficiaries to make claims on their behalf. *See* 42 U.S.C. §§1395u(b)(3)(B).

44.     Before accepting Medicare assignments, Defendant, and all providers who submit claims for services provided to Medicare beneficiaries, must certify that they will operate in accordance with the requirements established by the Secretary of the Department of Health and Human Services.

45. Although the Medicare contractor is checking for errors, the certifying physician or supplier is ultimately responsible for the accuracy of the information upon which the claim is based.

46. The government imposes several limitations on reimbursement that are relevant to this case. First, Medicare only pays for services that are "medically necessary." In other words, Medicare requires, as a condition of coverage, that services be "reasonable and necessary for the diagnosis or treatment of illness or injury." *See* 42 U.S.C. § 1395y(A)(1)(a). Providers who wish to participate in the Medicare program must ensure that their services are provided "economically and only when, and to the extent, medically necessary." *See* 42 U.S.C. § 1320c-5(A).

47. Federal law also prohibits providers from making "any false statement or representation of a material fact in any application for any… payment under a federal healthcare program." *See* 42 U.S.C. § 1320a-7(B)(A)(1).

48. At all times herein, Defendant had knowledge of its legal obligation to have knowledge of the public policies expressed in the laws and regulations herein mentioned and of the fact that it must comply with all applicable Federal laws in order for the services performed to be approved for coverage under Medicare.

## V. Medi-Cal

49. Medi-Cal is California's Medicaid program.

50. Medi-Cal is a public health insurance program that provides needed healthcare services for low-income individuals, including seniors, families with children, persons with disabilities, pregnant women, and low-income people with specific diseases, such as breast cancer and HIV/AIDS.

51. Medi-Cal is jointly funded by the state and federal government.

52. As of May 2022, over 14 million people are enrolled in Medi-Cal.

53. Before accepting Medi-Cal assignments, Defendant, and all providers who submit claims for services provided to Medi-Cal beneficiaries, must certify that they will

operate in accordance with the requirements established by the Secretary of the Department of Health and Human Services.

54.    At all times herein mentioned, Defendants had knowledge of the public policies expressed in the laws and regulations herein mentioned and of the fact that they must comply with all applicable State and Federal laws.

## VI.    Two Midnight Rule

55.    To address the issue of patients being treated as outpatients for extended periods of time, the Center for Medicare and Medicaid Services developed the Two-Midnight Rule.

56.    The Two-Midnight Rule established the Medicare payment policy regarding the benchmark criteria to use when determining whether inpatient admission is reasonable and necessary for purposes of payment under Medicare Part A.

57.    Under the Two-Midnight Rule, inpatient admissions would generally be payable under Part A if the admitting practitioner expected the patient to require a hospital stay that crossed two midnights and the medical record supported that reasonable expectation.

58.    Under CMS's Two-Midnight Rule: Inpatient admissions are generally payable under Part A if the admitting practitioner expects the patient to require a hospital stay that crossed two midnights and the medical record supported that reasonable expectation. https://www.cms.gov/newsroom/fact-sheets/fact-sheet-two-midnight-rule-0

59.    Medicare Part A payment is generally not appropriate for hospital stays expected to last less than two midnights.  Cases involving a procedure identified on the inpatient-only list or that were identified as "rare and unusual exception" to the Two-Midnight benchmark by CMS were exceptions to this general rule and were deemed to be appropriate for Medicare Part A payment.

60.    Because of the way the Medicare statute is structured Medicare payment rates for inpatient and outpatient hospital services differ.

A. CMS pays acute-care hospitals for impatient states under the Hospital Inpatient Prospective Payment System in the Medicare Part A Program, setting up payment rates prospectively for inpatient stays based on the patient's diagnoses, procedures, and severity of illness.

B. In contrast, the Hospital Outpatient Prospective System is paid under the Medicare Part B Program and is a hybrid of a prospective payment system and a fee schedule, with some payments representing costs packaged into a primary service and other payments representing the cost of a particular item, service, or procedure.

61. When a Medicare beneficiary arrives at a hospital in need of medical or surgical care, the physician or other qualified practitioner must decide whether to admit the beneficiary as an inpatient or treat as an outpatient, which significantly implicates the hospital payment and beneficiary cost sharing, as not all care provided in a hospital setting is appropriate for inpatient, Part A payment.

## FACTUAL ALLEGATIONS

62. In or around April 14, 2021 Relator began working at Oroville Hospital as a PA in the Emergency Room.

63. Relator was staffed through CompHealth, a healthcare staffing firm.

64. At Oroville, ER Doctors, Hospitalists, PAs, and Nurses are supervised by Megan Shorter ("Shorter"), the Assistant Director of the ER.

65. Shorter recruits employees through a number of avenues, including directly employing professional or by contracting people through physician staffing firms, such as TeamHealth and CompHealth.

66. Hospitalists travel from Los Angeles to work at Oroville because of the higher compensation they are available to obtain from the kickback scheme at Oroville.

67. Oroville is a 153-bed acute care facility located in Oroville, California.

68. Oroville is a non-profit hospital that serves a lower socio-economic population.

69. Relator estimates that approximately 70% of the patients at Oroville are insured by Medicaid and Medicare.

70. Relator estimates that only 30% of Oroville's patients are privately insured.

71. Day to day, management does not play an active role in observing employees at Oroville.

72. During his time at Oroville, Relator witnessed widespread pressure to admit as many patients as possible, abuse of CMS's Two-Midnight Rule, and a kickback scheme.

## I. Oroville Inappropriately Admits Patients

73. Relators estimates that more than 70% of ER patients are admitted at Oroville.

74. Oroville's ER is staffed with six to eight hospitalists, with additional floating support during the busiest shifts.

75. Hospitalists are essentially tasked with admitting patients to the ER.

76. Hospitalists at Oroville are 24/7 fixtures in the ER, with their own dedicated computers and marching orders to push ER staff to admit patients to the hospital rather than discharge patients whose evaluations and treatments are complete.

77. Similar to hospitalists, charge nurses are always on shift in Oroville's ER.

78. Charge nurses also have their own orders to put admit orders in for every patient in the ER, including patients in the waiting room that had not been evaluated by a doctor or other healthcare provider, when midnight approached, and without a doctor's or other health care provider's verbal order.

79. The charge nurses put these admit orders under a doctor or other healthcare provider's name without the verbal order from that doctor or other healthcare provider's knowledge.

80.    At other facilities Relator has worked at, charge nurses are only able to put in admission orders with a doctors or other healthcare provider's verbal permission. However, charge nurses do not have the authority to independently admit any patient without consulting a doctor or other healthcare provider.

81.    Relator witnessed Oroville ER's practice of admitting as many patients as possible.

82.    Relator had never witnessed this practice in his prior experience as a PA.

83.    In Realtor's experience, the objective for patient disposition was to safely discharge patients and send them home and to only admit if medically necessary.

84.    At other ERs Relator witnessed charge nurses seeking doctors or other healthcare providers verbal permission which would be discussed and if deemed medically necessary, permission would be granted for the charge nurse to admit under that doctor or other healthcare provider's name.

85.    In fact, at Oroville, the focus on admitting as many patients into the hospital as possible has had a significant negative impact on the quality of medical care patients receive.

86.    Specifically, Relator recalls that patients were unnecessarily being exposed to communicable diseases, such as COVID-19.

87.    Paul Robie ("Robie"), head of the PA team and who reported directly to Shorter, was constantly pressuring Relator and others to admit patients to the ER.

88.    On one occasion, Relator recalls Robie telling Oroville employees to "admit, admit, admit."

89.    Relator recalls Robie explaining the reasoning for stressing the importance of admitting patients. Robie stated that this was how the bills were paid.

90.    Relator also witnessed charge nurses unnecessarily admitting patients who had minor injuries, such as a runny nose and a sprained ankle.

91.    Relator once walked into the doctor's lounge in the ER and found Robie meeting with ER medical director, Priss Harman, and CEO, Robert Wentz. They were discussing the volume of patient admissions and had a presentation up on a shared screen that showed admissions.

92.    Relator recalls being shocked by the encounter for several reasons. Primarily, he was surprised to see such high-level executives meeting with Robie. Relator was also surprised that they were meeting in the doctor's lounge to review a presentation. Finally, Relator was surprised that they were discussing patient admissions. Relator was not permitted to stay but does know that this meeting occurred weekly.

93.    The focus on increasing admissions was discussed openly with everyone working in the ER.

94.    Often Relator would overhear employees joking about the admittance issue. Some employees would even go as far as joking that they should admit family members of the patients who were in the waiting room to boost the number of admissions.

95.    Patient admission status was tracked on the wall with admissions into the hospital shown in green and discharges displayed in red.

96.    Dr. Paul Berry joked about the color coordination, stating that the green admittances paid for his lake house and the red discharges was the color of the devil.

97.    It was encouraged through ER staff to show more "green" admittances on the board than "red" discharges.

98.    Relator estimated that about 70% of ER patients were admitted, despite less than 50% being eligible for admission on average.

99.    Oroville hospitalists went further still to ensure the number of patients being admitted was high.

100.    Relator recalls hospitalists using fear tactics with the patients to talk them into agreeing to be admitted, rationalizing that there was no harm in being admitted for observations.

101.    Relator once recalls a hospitalist telling a patient they might die if not admitted to the hospital.

102.    Despite the hospitalists pressuring the patients to agree to being admitted, Relator would sometimes write notes in patient charts stating, "after further discussion the patient changed their mind and will no longer be going home."

103.    Admitting surgery floor nurse Kristy Bell-Arnold ("Bell-Arnold") observed Oroville admitting many patients automatically from the ER before the evaluations of the patients were complete.

104.    Bell-Arnold further states:

A. Oroville was chronically short staffed with a high turnover rate of patients. This meant burnout was common in Oroville employees.

B. The nurse-to-patient ratio "seemed out of whack" with there sometimes being no certified nurse aides available to assist given the high number of admits.

C. Most of the patients on Bell-Arnold's floor were admitted from the ER.

D. The vast majority of patients were low income and homeless.

E. The hospital tended to admit the same people over and over again.

F. Ami Berg and Sara Story were both medical surgery managers and were the ones actually giving the orders to the medical surgery floor staff who were admitting patients.

G. The high rate of admits meant that there was limited space in which to place patients and employees were struggling to keep up with the constant turning-over of the rooms.

H. There were so many admitted patients that clinical managers often had to help out on the floor.

105.    The COVID-19 global pandemic did not have an impact on the rate at which patients were being admitted at Oroville. However, the patients that were admitted with

COVID-19 could have easily been sent home and most of the time did not require a ventilator or supervision.

106.    Relator recalls ER doctors rationalizing the high admittance rate at Oroville by stating that the patients "are indigents so they don't get follow-up care with us anyway."

107.    The high admit rate at Oroville is not due to COVID-19, the economic status of its patients, or the severity of the patient's injuries. Oroville admits patients at a high rate to maximize reimbursement from federal healthcare programs.

II.    **Oroville Admits Patients close to Midnight to meet the "two midnight rule" and Maximize Reimbursements**

108.    When Relator worked overnight shifts at Oroville, he observed another fraudulent practice to maximize reimbursement from federal healthcare programs.

109.    When midnight approaches, the ER charge nurses change the status of ER patients in the system to reflect them as admitted into the hospital. This way if the patient does get admitted, Medicare will be billed for an extra day of admission.

110.    However, if the patient is not ultimately admitted then the charge nurse simply retroactively amends the admission order and backs out the patient from the system.

111.    While a patient might ultimately need to be admitted, the timing of the admission, right before midnight and without having yet been seen by a doctor, is solely for monetary purposes. Specifically, being within scope of the Two-Midnight Rule for a Medicare Part A payment.

112.    Oroville's practice of admitting patients just before midnight ensures that all admissions can qualify for the two-midnight rule.

113.    Both Relator and Bell-Arnold witnessed this practice and recall that patients frequently stay for a maximum of two-nights at Oroville before they are discharged.

114. Oroville "certainly ran very smoothly" admitting patients as the day approached midnight for an extra day's worth of admission says Bell-Arnold.

115. The practice of admitting as many patients as possible and trying to take advantage of CMS's two-midnight rule is encouraged at Oroville through a kickback scheme.

### III. Admitting patients for kickbacks

116. Shorter recruits employees to work at Oroville.

117. Shorter is particularly aggressive in her recruiting of ER doctors and hospitalists.

118. Shorter offers hospitalist and ER doctors additional compensation to work at Oroville from a kickback scheme.

119. Shorter offers ER doctors an additional $120 per patient that is admitted.

120. Shorter offers hospitalists an additional $130 per patient that is admitted.

121. Shorter uses these admission incentives to recruit ER doctors and hospitalists.

122. The incentives work and many doctors from Los Angeles commute all the way to Oroville, California to take advantage of the kickback scheme.

123. Relator recalls that when a friend applied for a job at Oroville in August of 2021 and was interviewed for the position, Shorter offered his friend this kickback scheme.

124. Relator's friend did not take the job at Oroville but relayed the story of the kickback offer to the Relator.

125. On another occasion, Shorter offhandedly told Relator and another doctor that Mark Bernardi, another Oroville doctor, had accused Oroville of committing fraud before he quit.

126.    Relator uncomfortably laughed and excused himself from the conversation but was encouraged to hear that others were recognizing that Oroville was acting in a fraudulent manner.

127.    Shortly after this interaction Relator asked to stop working at Oroville.

128.    On or around August 30, 2021, Relator stopped working at Oroville.

**IV.    Oroville Uses Three Fraudulent Schemes to Maximize Reimbursement from Federal Healthcare Programs.**

129.    Oroville admits as many patients as possible to maximize reimbursement from federal healthcare programs.

130.    Oroville admits patients as midnight approaches to ensure the patient is able to meet CMS's two-midnight rule and maximize reimbursement.

131.    Oroville offers ER doctors and hospitalists kickbacks to encourage them to admit as many patients as possible and ultimately maximize reimbursement.

132.    These three fraudulent schemes harm not only the patients of Oroville but the United States and its taxpayers.

133.    Relator alleges these violations to assist the government in recouping the monetary damages it has sustained from Oroville's fraudulent conduct.

**COUNT I**
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**

134.    Relator incorporates all the allegations set forth in the foregoing paragraphs as though fully alleged herein.

135.    The False Claims Act imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

136.    The result of Defendant Oroville's actions has led the government to pay for excessive patient admittances and unnecessary testing which Defendant Oroville received money from federal Medicare program and federal Medicaid program.

137. Defendant Oroville submits claims for payment and approval, knowing these claims for payment to be false.

138. The false claims Defendant Oroville submits to Medicare and Medicaid are violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

139. The United States of America has been damaged by all aforementioned misrepresentations and failures to comply with requisite laws and regulations in an, as of yet, undetermined amount.

**COUNT II**
**Violations of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

140. Relator incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

141. The False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

142. Defendant Oroville, often through the doctors and hospitalists admitting unnecessary patients, created a false record material to a false claim.

143. The result of Defendant Oroville's actions has led the government to pay for excessive and unnecessary testing and observances of patients, and kickbacks to doctors, which Defendants received payments from the federal Medicare program and federal Medicaid program.

144. Defendant Oroville, knowingly makes, uses, and causes to be made false records and statements, which are then used to submit false claims to the federal government.

145. The false records and statements that Defendant Oroville makes are used to support false claims Defendant Oroville submits to Medicare and Medicaid in violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)–(B).

146.    The United States of America has been damaged by all aforementioned misrepresentations and failures to comply with requisite laws and regulations in an, as of yet, undetermined amount.

### COUNT III
### Violations of the California False Claims Act
### Cal. Gov't Code § 12651(a)(1)

147.    Relator incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

148.    The California False Claims Act imposes liability on any person who knowingly presents or causes to be presented a false or fraudulent claim to the State of California for payment or approval.  Cal. Gov't Code § 12651(a)(1).

149.    Defendant Oroville knowingly presents or causes to be presented claims to Medi-Cal, a State of California program, to fraudulently obtain payment for services to unnecessary patients and its failure to discharge them.

150.    The false statements and claims for payment were material to the government's decision to pay.  When submitting a claim for payment, providers must certify that the drugs, procedures, services, and tests were administered.

151.    But for Defendant Oroville's submission of these claims and their false certifications that the services and tests were administered, Medi-Cal would not have paid Defendant Oroville for the services and tests administered.

152.    Defendant Oroville acted with the requisite scienter. Doctors knowingly and were told by Shorter to admit patients and would receive incentives for doing so, patients were tricked into agreeing to stay longer at Oroville, and false records were created to have patients admitted.

153.    The false claims Defendant Oroville submits to Medi-Cal are violations of the California False Claims Act, Cal. Gov't Code § 12651(a)(1), and have cost the State of California and taxpayers money.

154. Accordingly, State of California is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT IV
### Violations of the California False Claims Act
### Cal. Gov't Code § 12651(a)(2)

155. Relators incorporates all the allegations set forth in the foregoing paragraphs as though fully alleged herein.

156. The California False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State of California. Cal. Gov't Code § 12651(a)(2).

157. Defendant Oroville knowingly makes or causes to be made false records and statements to a false claim submitted to Medi-Cal, a State of California program, for payment or approval.

158. As set forth more fully above, Defendant Oroville creates false records to have patients admitted prior to midnight to take advantage of the two-midnight rule and admits unnecessary patients resulting in unnecessary services and tests administered.

159. Defendant Oroville go so far as to delete the record if the unnecessary patient they admitted ends up being discharged.

160. The false records and statements Defendant Oroville makes are used to support false claims Defendant Oroville submits to Medi-Cal in violation of the California False Claims Act, Cal. Gov't Code § 12651(a)(1)–(2), and have cost the State of California and taxpayers money.

161. Accordingly, the State of California is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America and the State of California, and on his own behalf, prays that judgment will be

entered against Defendant for violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*; and the California False Claims Act, Cal. Gov't Code § 12651 *et seq.* as follows:

a) That for violations of the False Claims Act, 31 U.S.C. §3729, *et seq.*, this Court enter judgment against the Defendant in an amount equal to three times the amount of damages the United States government has sustained because of the Defendant's actions, plus a civil penalty of $11,000 for each act in violation of 31 U.S.C. §3729;

b) That for violations of the California False Claims Act, Cal. Gov't Code. § 12561, *et seq.*, this Court enter judgment against the Defendant in an amount equal to three times the amount of damages the State of California has sustained because of the Defendant's actions, plus a civil penalty of $11,000 for each act in violation of Cal. Gov't Code. § 12561, *et seq*;

c) That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §3730(d), including the costs and expenses of this action and reasonable attorneys' fees;

d) That, in the event the United States Government elects to intervene in and proceed with this action, Relator be awarded between 15% and 25% of the proceeds of the action or of any settlement in accord with 31 U.S.C. § 3730(d)(1);

e) That, in the event that the United States Government does not proceed with this action, Relator be awarded between 25% and 30% of the proceeds of the action or of any settlement in accord with 31 U.S.C. § 3730(d)(2);

f) That, pursuant to 31 U.S.C. § 3730(c)(5), Relator be awarded a share of any alternate remedy that the United States Government elects to pursue;

g) That the United States government and Relator receive all other relief, both in law and equity, to which they are reasonably entitled.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
23

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a jury trial.

October 11, 2022                    Respectfully Submitted,

/s/ J. Bernard Alexander III
J. Bernard Alexander III (State Bar No. 128307)
ALEXANDER MORRISON + FEHR LLP
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
(310) 394-0888
balexander@amfllp.com

R. Scott Oswald, (to be admitted *pro hac vice*)
Janel Quinn. (to be admitted *pro hac vice*)
The Employment Law Group, P.C.
1717 K St., NW
Suite 1110
Washington, D.C. 20006
(202) 261-2813
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
jquinn@employmentlawgroup.com

Attorneys for *Qui Tam* Plaintiffs